FILED

SPENCER E. BENDELL, Cal. Bar No. 181220
Email: bendells@sec.gov
TERI M. MELSON, Cal. Bar No. 185209
Email: melsont@sec.gov

2011 AUG 11  AM 11: 48

CLERK U.S. DISTRICT COURT
CENTRAL DIST. OF CALIF.
LOS ANGELES

BY _____

Attorneys for Plaintiff
Securities and Exchange Commission
Rosalind R. Tyson, Regional Director
Michele Wein Layne, Associate Regional Director
5670 Wilshire Boulevard, 11th Floor
Los Angeles, California 90036
Telephone:  (323) 965-3998
Facsimile:   (323) 965-3908

# UNITED STATES DISTRICT COURT

## CENTRAL DISTRICT OF CALIFORNIA

SECURITIES AND EXCHANGE
COMMISSION,

       Plaintiff,

   vs.

TOBY G. SCAMMELL,

      Defendant.

Case No. LACV11-6597 DSF(MRWx)

**COMPLAINT FOR VIOLATIONS OF THE FEDERAL SECURITIES LAWS**

Plaintiff Securities and Exchange Commission ("Commission") alleges as follows:

## SUMMARY OF THE ACTION

1.      This case involves unlawful insider trading by Defendant Toby G. Scammell (the "Defendant" or "Scammell") in the securities of Marvel Entertainment, Inc. ("Marvel") just a few weeks before the August 31, 2009 announcement that the Walt Disney Company ("Disney") planned to acquire Marvel for $50 per share.

2.      From August 13, 2009 through August 28, 2009, Scammell, who was 24 years old at the time, spent $5465 on highly speculative and risky purchases of options to buy stock ("call options") of Marvel that expired within a few weeks. Specifically, between August 13, 2009 and August 28, 2009, Scammell purchased 647 Marvel call option contracts which entitled him to purchase Marvel stock at prices of $50 and $45 (the so-called "exercise" or "strike" price) that would expire on September 19, 2009.  On August 28, 2009, Scammell also purchased: (1) 9 call option contracts with a strike price of $40 and an expiration date of September 19, 2009; and (2) 3 call option contracts with a strike price of $40 and an expiration date of December 18, 2009.

3.      At the time Scammell purchased these Marvel securities, Marvel's stock price had never closed above $41.74, making Scammell's purchase of Marvel call options with strike prices of $50 and $45 highly remarkable, especially where the majority of the options were set to expire within a few weeks.  In many instances, Scammell's transactions represented over 90% of the market volume for the option series purchased by Scammell.

4.      Scammell had never before traded in Marvel securities and had only one, very unsuccessful, prior experience trading call options.

5.      Scammell had limited personal funds at the time he purchased the Marvel call options, so he secretly used the funds of his older brother to purchase

- 2 -

1    more than half of the Marvel call options.  Scammell had obtained trading

2    authority over his brother's account when his brother was deployed to serve in

3    Iraq with the United States Army in March 2006.

4         6.    After the announcement on Monday, August 31, 2009 that Disney

5    planned to acquire Marvel, Marvel shares closed at $48.37, up more than 25%

6    from the closing price of $38.65 on Friday, August 28, 2009.

7         7.    Over the next few days following the August 31 announcement,

8    Scammell sold all of the Marvel option contracts in his account and in the account

9    belonging to his brother.  In less than one month, Scammell made a total of more

10   than $192,497 (or over 3000%) in profits from trading while aware of material

11   nonpublic information.

12        8.    Prior to the announcement, Scammell misappropriated news of

13   Disney's impending acquisition of Marvel from his girlfriend of two years.

14        9.    In June 2009, Scammell's girlfriend began a six month externship in

15   Disney's corporate strategy department in Burbank, California.  During a staff

16   meeting at Disney on or about June 30, 2009, Scammell's girlfriend was told that

17   Disney planned to acquire Marvel, and Scammell's girlfriend was later assigned to

18   work on the Marvel acquisition.

19        10.   Scammell's girlfriend worked long hours on the Marvel acquisition

20   during July and August 2009, before the acquisition was announced, and received

21   detailed information about the acquisition, including the $50 per share acquisition

22   price and when the acquisition would be announced.  Scammell lived with his

23   girlfriend in Los Angeles, California, in July 2009, and after he moved out in

24   August 2009 he continued to speak with her several times each day by telephone.

25        11.   In breach of his duty of trust and confidence to his girlfriend,

26   Scammell misappropriated from his girlfriend material nonpublic information

27   regarding Disney's impending acquisition of Marvel.  Scammell exploited his

28   personal relationship for monetary gain, and his misuse of confidential

1    information gave him an illegal advantage over other traders in the market.

2          12.    Scammell violated Section 10(b) of the Securities Exchange Act of

3    1934 ("Exchange Act"), 15 U.S.C. § 78j(b) and Exchange Act Rule 10b-5,

4    17 C.F.R. § 240.10b-5, by trading in Marvel securities while he was aware of

5    material nonpublic information, in breach of a duty of trust or confidence

6    Scammell owed to his girlfriend.

7                        **JURISDICTION AND VENUE**

8          13.    The Commission brings this action pursuant to Sections 21(d) and

9    21A of the Exchange Act, 15 U.S.C. §§ 78u(d) & 78u-1.

10         14.    This Court has jurisdiction over this action pursuant to Sections

11   21(e),  21A and 27 of the Exchange Act, 15 U.S.C. §§ 78u(e), 78u-1 & 78aa.

12         15.    In connection with the conduct described herein, Scammell, directly

13   or indirectly, made use of the means or instrumentalities of interstate commerce,

14   or the mails, or the facilities of a national securities exchange.

15         16.    Venue is proper in this district pursuant to Section 27 of the

16   Exchange Act, 15 U.S.C. § 78aa, because a substantial portion of the conduct

17   alleged in this Complaint occurred within the Central District of California.  As

18   alleged in this Complaint, much of the conduct arose out of Scammell's

19   misappropriation of material nonpublic information while he lived with his

20   girlfriend in Los Angeles, California, and while his girlfriend worked at Disney in

21   Burbank, California.

22                              **DEFENDANT**

23         17.    **Toby G. Scammell**, age 26, currently resides in Greenbrae,

24   California.

25                    **OTHER RELEVANT ENTITES**

26         18.    **The Walt Disney Company**, a Delaware corporation, has its

27   principal offices in Burbank, California.

28         19.    **Marvel Entertainment, Inc.** was an entertainment company

incorporated in Delaware with its principal place of business in New York, New York.  On August 31, 2009, Disney and Marvel publicly announced that Marvel had agreed to be acquired by Disney in a stock and cash deal valued at $50 per share.  Prior to the acquisition, Marvel had a class of securities registered pursuant to Section 12(b) of the Exchange Act and Marvel common shares were listed on the New York Stock Exchange under the symbol "MVL."  Following the approval of the acquisition between Marvel and Disney on January 1, 2010, Marvel shareholders received Disney stock and Marvel stock was deregistered.

## FACTS

**A.**     **Through His Girlfriend, Scammell Became Aware That Disney Planned to Announce By Labor Day 2009 That It Would Acquire Marvel**

20.     Scammell and his girlfriend met in July 2007 while working together in Los Angeles, California at a consulting company.  In or around September or October 2007, Scammell and his girlfriend began a romantic relationship.

21.     In June 2009, Scammell's girlfriend began an externship at the corporate strategy department at Disney in Burbank, California.  Scammell was aware that his girlfriend was working in Disney's corporate strategy department and was working on mergers, acquisitions and similar projects.

22.     On or about June 30, 2009, Scammell's girlfriend attended a staff meeting at Disney in which she learned that Disney planned to acquire Marvel.  Scammell's girlfriend was told and understood that such information was confidential.

23.     On June 30, 2009, following the staff meeting, Scammell's girlfriend sent an e-mail to Scammell, who was vacationing in Africa at the time, referring to the Marvel acquisition, although she did not identify Marvel by name.  Specifically, Scammell's girlfriend wrote to Scammell in an e-mail on June 30, 2009: "There's this opportunity at work to get placed on a really cool project.  Basically, it would give me a lot of finance/valuation experience, great on my

resume, will get exposure to all parts of the process of this thing, and will provide steady staffing for the next 3+ months which would be awesome." She further stated in the e-mail that "[i]t would be something that people would recognize right away." Scammell's girlfriend explained in the email that she could not tell Scammell the name of the entity involved because of "confidentiality," but she noted that "it's very recognizable and nothing I've mentioned before." She wrote that the "downside" would be "that it will be super tough, crazy hours, and working with not such a great team." She informed Scammell that it would be staffed "in the next day or two" and "it could be a pretty amazing experience" and wrote back a few hours later explaining that "[i]t looks like this deal's too big for my first gig, a bit of a disappointment but we'll see."

24.     In mid-July 2009, Scammell returned from Africa and moved into his girlfriend's apartment in Los Angeles, California.  Scammell had access to his girlfriend's Blackberry on occasion, and she would give him the password so that he could look up an address or directions.

25.     By July 24, 2009, the Marvel deal had heated up at Disney, and Scammell's girlfriend was assigned to work on it.  Scammell's girlfriend sent a text message to Scammell the morning of July 24, 2009, telling him that she had been "pulled on 'the big project.'"

26.     During the next five weeks, Scammell's girlfriend worked long hours on the Marvel acquisition, including sometimes from home, and received detailed information about the anticipated acquisition, including the $50 per share acquisition price and when the acquisition would be announced.

27.     Although Scammell moved to San Francisco on or about August 2, 2009, in order to work as an associate for an investment fund, Scammell and his girlfriend continued to speak by telephone several times each day and spent the weekend of August 21-23, 2009, together.

28.     Scammell and his girlfriend often discussed her work projects at

Disney, and Scammell was aware that his girlfriend was working on a large acquisition at Disney.  Scammell and his girlfriend had multiple discussions about whether his girlfriend should delay her business school applications so that she could write about the high-profile acquisition she was working on at Disney as part of her business school applications.

29.    By August 10, 2009, Scammell's girlfriend learned that the acquisition would be announced by Labor Day and informed Scammell that the timing of the announcement would allow them to attend her friend's wedding. Around this time, Scammell began searching the internet regarding call options.

30.    By no later than August 13, 2009, Scammell had obtained the identity of the acquisition target from his girlfriend, whether through overhearing one or more of his girlfriend's Marvel-related conversations, by seeing electronic or paper documents in her possession related to the Marvel acquisition, or through her conversations with him.

**B.**    **After Becoming Aware of Material Nonpublic Information about Marvel, Scammell Purchased Marvel Call Options**

31.    From August 13 through August 28, 2009, Scammell purchased 659 Marvel call option contracts with strike prices of $50, $45 and $40.  Specifically, Scammell purchased the following:

> a.  On August 13, 2009, Scammell purchased 125 Marvel call option contracts with a strike price of $50 and an expiration date of September 19, 2009, in his brother's account.

> b.  On August 14, 2009, Scammell purchased 2 Marvel call option contracts with a strike price of $45 and an expiration date of September 19, 2009, in his brother's account.

> c.  On August 17, 2009, Scammell purchased 60 Marvel call option contracts with a strike price of $45 and an expiration date of September 19, 2009, in his account.

d. On August 26, 2009, Scammell purchased 75 Marvel call option contracts with a strike price of $45 and an expiration date of September 19, 2009, in his account.

e. On August 27, 2009, Scammell purchased 200 Marvel call option contracts with a strike price of $45 and an expiration date of September 19, 2009, in his brother's account.

f. On August 28, 2009, Scammell purchased 110 Marvel call option contracts with a strike price of $45 and an expiration date of September 19, 2009, in his account.

g. On August 28, 2009, Scammell purchased 75 Marvel call option contracts with a strike price of $45 and an expiration date of September 19, 2009, in his brother's account.

h. On August 28, 2009, Scammell purchased 9 Marvel call option contracts with a strike price of $40 and an expiration date of September 19, 2009, in his account.

i. On August 28, 2009, Scammell purchased 3 Marvel call option contracts with a strike price of $40 and an expiration date of December 18, 2009, in his brother's account.

32. Scammell used the internet to purchase all of the Marvel call options through Ameritrade.

33. Scammell spent a total of $5464.16 on the Marvel call options he purchased in his account and in his brother's account. Scammell's brother had given Scammell power of attorney to act on his behalf regarding financial matters when he was deployed to serve in Iraq with the United States Army in March 2006. Scammell continued to manage his brother's finances after his return from Iraq in 2007, and although they spoke frequently, Scammell never told his brother that he had invested his brother's money in Marvel.

34. Between August 31, 2009 (the date it was announced that Disney

would acquire Marvel), and September 9, 2009, Scammell sold all of the Marvel call options in his account and in his brother's account, including those with a $50 strike price, for $197,960.77 and reaped profits of $192,496.61.

**C.     Scammell's Purchases of Marvel Call Options Were Unusual**

35.     Scammell had never invested in Marvel before he began acquiring the Marvel call options in August 2009.  During the time that he invested in Marvel, Scammell did not purchase any other securities.  Scammell's only prior purchase of call options involved the purchase of Google long-term call options that did not expire for more than one year and which he sold at a loss of more than 99%.

36.     Scammell's purchase of the Marvel options represented over 90% of the daily market volume for those options in most instances.  Scammell represented 100% of the daily market volume for the series of call options he purchased in the following instances: (1) on August 13, 2009, when he purchased the September $50 Marvel call options; (2) on August 14, 2009, when he purchased September $45 Marvel call options; and (3) on August 27, 2009, when he purchased the September $45 Marvel call options.

37.     Scammell knew that Marvel's stock price had never been above $41.74 when he purchased the short term call options with strike prices of $50 and $45.

38.     The first Marvel call options Scammell purchased had a strike price of $50, the specific amount Disney agreed to pay for Marvel stock.

39.     Except for the three Marvel call options with a strike price of $40 that Scammell purchased on August 28, 2009, all of the Marvel call options Scammell purchased were set to expire on September 19, 2009, just a few weeks after the Marvel acquisition was to be announced.

40.     Scammell's pattern of trading was especially unusual on Friday, August 28, the last trading day before the acquisition announcement.  On that

1   date, Scammell placed ten separate limit orders to purchase Marvel call options

2   with a strike price of $40, canceled each one within less than a few hours when it

3   was not successful, and then increased his bid. He continued this pattern of

4   trading throughout the day, until he was finally able to purchase the call options

5   with a strike price of $40 just a few minutes before trading closed on August 28,

6   2009.

7   **D.   Additional Circumstantial Evidence of Scammell's Insider Trading**

8       41.   Scammell purchased short term Marvel call options, which had

9   exercise prices above the then-current price of Marvel stock (so-called "out-of-

10  the-money" call options) while he was aware of the impending announcement that

11  Disney would acquire Marvel.

12      42.   The purchases were highly risky for Scammell personally. He had

13  limited funds at the time he purchased many of the Marvel call options, and

14  therefore Scammell used over $2800 of his brother's money to purchase more

15  than half of the Marvel call options.

16      43.   Scammell's use of his brother's funds was unusual. Scammell had

17  already arranged for his brother to automatically invest $196 each month into his

18  brother's IRA account. The investment in Marvel call options represented an

19  amount that was more than fourteen times the normal monthly investment by

20  Scammell's brother.

21      44.   Scammell's general investment strategy for his brother's brokerage

22  account and IRA account was to purchase "long-term, stock-only basket of stocks,

23  ETFs," not risky call options.

24      45.   Scammell never told his brother he was researching or investing his

25  money in Marvel, even though Scammell spent the weekend with his brother just

26  two days after he purchased the initial Marvel call options in his brother's

27  account.

28      46.   Scammell's brother e-mailed Scammell one week before Scammell

- 10 -

made the initial purchase of Marvel call options and wrote that he was "going to need more in the bank over the next 2 weeks than usual due to various expenses" and asked that Scammell therefore "sell some stocks etc. so that I have about $1000-$2000 in my account to cover upcoming expenses."

47.   Scammell was expecting to receive several thousand dollars at the end of August 2009, but he used his brother's funds to make the initial investment in Marvel because he believed it was necessary to invest in Marvel "before the end of August."

48.   On or about August 16, 2009, before Scammell purchased the majority of the Marvel options, Scammell searched the internet for the terms "insider trading," "tender offer," "Williams Act," "Rule 10b-5," and "material, non-public information" and read several articles on Wikipedia regarding those topics.

49.   Scammell often discussed possible investments with friends, including his girlfriend and his brother, but he never mentioned Marvel as a possible investment to anyone, even though he claims he was doing substantial research regarding Marvel throughout July and August 2009.

50.   Scammell did not tell anyone, including his girlfriend or his brother, about the more than $192,000 he made in profits from his Marvel trades.

51.   Scammell never told his brother that his brother's account earned over $100,000 in profits from the sale of Marvel call options.  Instead, Scammell moved $100,000 of profits from the sale of Marvel call options into a new account.  Although Scammell had previously arranged for his brother to receive an automatic update of his financial accounts each week by e-mail, Scammell did not link the new account into which he transferred the proceeds of the trades to his brother's automatic e-mail update.  As a result, Scammell's brother did not learn of the Marvel trades made in his account or of the resulting $100,000 in profits in his account until several months later when Scammell's brother was contacted as

1    part of the Commission's investigation in November 2009.

2         52.    Scammell admitted that one of the reasons he did not tell his brother

3    about the substantial profits he earned from trading Marvel securities was because

4    "there was potential for, you know, somebody who is viewing two data points in

5    isolation without proper context to draw inaccurate conclusions" and he was

6    concerned that his brother would think that his girlfriend's work at Disney had

7    affected Scammell's decision to trade in Marvel.

8    **E.    Scammell Failed to Provide a Credible Explanation For His Trades**

9         53.    Scammell has failed to provide a credible explanation for his

10   purchase of the short term, out-of-the-money Marvel call options.

11        54.    Scammell first claimed he originally became interested in investing

12   in Marvel because he believed that Marvel's comic content was undervalued and

13   that Marvel DVDs were more likely to be purchased rather than rented by

14   consumers.  However, Scammell has admitted that he performed little or no

15   research on Marvel characters and he admitted that although Marvel "may be

16   better positioned than other players . . . they're going to suffer from the same

17   ultimate demise of their DVD sales" and in "seven years, they won't even make

18   DVDs."

19        55.    Scammell also claimed he did extensive research regarding Marvel

20   and stated that Marvel's earnings the first week of August "were strong" and

21   "analysts agreed earnings and outlook were good."  However, the articles and

22   analyst reports Scammell claims he read presented, at best, a mixed picture

23   regarding Marvel's future earnings and none suggested Marvel's stock price

24   would increase significantly within the next two to four weeks.  In fact, most

25   articles noted that Marvel's revenues for the third quarter of 2009 were down from

26   the second quarter of 2009 and from the prior year.  In addition, at least one article

27   Scammell claimed to have read stated that "[w]ith no new self-financed movies on

28   the 2009 schedule, Marvel Entertainment reported a sharp drop in earnings last

- 12 -

1    quarter."

2         56.    Scammell further claimed that he decided to buy additional $45

3    Marvel call options for $0.15 each on August 17, 2009, after he saw that the

4    options traded for $0.25 on that day.  He testified that he was "certain" he saw the

5    trade for $0.25 on August 17 "because that's something you definitely look at"

6    and since it was "the actual trade that happened" and "not theoretical," it was

7    "powerful" and gave him "conviction."  However, no such $0.25 trade actually

8    took place on that date.

9         57.    Scammell claimed that a small increase in the Marvel stock price

10   would result in a significant increase in the price of the Marvel options he

11   purchased, even if only for a few seconds during the day.  However, Scammell did

12   not have any limit orders in place to sell his Marvel call options prior to the

13   August 31, 2009 acquisition announcement.  Therefore it was unlikely that any of

14   his call options would be sold even if Marvel's stock temporarily increased during

15   an intraday price swing.

16   **F.    Scammell Breached His Fiduciary Duty to His Girlfriend When He**

17        **Traded While He Was Aware of the Material Nonpublic Information**

18        **He Misappropriated from Her**

19        58.    Based on the close nature of their relationship, Scammell owed his

20   girlfriend a duty of trust and confidence.

21        59.    At the time he purchased the Marvel call options, Scammell had been

22   dating his girlfriend exclusively for two years, and Scammell considered his

23   girlfriend to be his best friend.

24        60.    Scammell and his girlfriend often confided in each other and had a

25   history, pattern or practice of sharing personal and confidential information with

26   each other.

27        61.    At all times, Scammell knew or was reckless in not knowing that his

28   girlfriend, due to her employment and position in the corporate strategy

- 13 -

1   department at Disney, had access to material nonpublic information about

2   prospective mergers or acquisitions involving Disney.

3       62.   Scammell similarly knew or was reckless in not knowing that if he

4   obtained access to confidential information to which his girlfriend had access in

5   connection with her employment at Disney that he should maintain such

6   information in confidence and not use that information to his personal benefit.

7       63.   By trading Marvel options while he was aware of material nonpublic

8   information he misappropriated from his girlfriend, Scammell breached a duty of

9   trust or confidence he owed to his girlfriend.

10  **G.   Scammell Acted with Scienter When He Traded While He Was Aware**

11       **of the Material Nonpublic Information to Which His Girlfriend Had**

12       **Access**

13      64.   In purchasing the Marvel call options, Scammell acted with scienter.

14      65.   Scammell was familiar with the insider trading laws based upon his

15  experience, as well as his work and training at a consultant company in Los

16  Angeles, California.

17      66.   In addition, Scammell researched the law regarding insider trading

18  prior to making most of his Marvel trades.

19      67.   Scammell's girlfriend expressly told Scammell that the acquisition

20  target she was working on at Disney was confidential and Scammell understood

21  that his girlfriend's work at Disney was confidential.

22      68.   Scammell knew, or was reckless in not knowing, that the information

23  he obtained from his girlfriend regarding the impending Marvel acquisition was

24  confidential, material, and nonpublic.

25  ///

26  ///

27  ///

28  ///

## CLAIM FOR RELIEF

### FRAUD IN CONNECTION WITH THE PURCHASE OR SALE OF SECURITIES

**Violations of Section 10(b) of the Exchange Act and Rule 10b-5 Thereunder**

69.     The Commission realleges and incorporates by reference ¶¶ 1 through 68, above.

70.     As alleged above, Defendant Scammell learned material nonpublic information concerning Marvel from his girlfriend.  At all relevant times, Scammell owed his girlfriend a fiduciary duty, or similar duty of trust or confidence, to maintain such information in confidence.

71.     Scammell, in breach of fiduciary duty or similar relationship of trust or confidence owed to his girlfriend, misappropriated such material nonpublic information by trading on the basis of such information.

72.     The misappropriated information was material because it would be important to a reasonable investor in making his or her investment decision. There is a substantial likelihood that the disclosure of the misappropriated information would have been viewed by a reasonable investor as having significantly altered the total mix of information available to investors.

73.     At all times relevant to this Complaint, Scammell acted knowingly and/or recklessly by misappropriating material nonpublic information about the Marvel acquisition and purchasing Marvel call options on the basis of that information.  Because he was aware of the material nonpublic information at the time he purchased Marvel call options, Scammell traded on the basis of  that material nonpublic information.

74.     By engaging in the conduct described above, Scammell, directly or indirectly, in connection with the purchase or sale of securities, by the use of means or instrumentalities of interstate commerce, or the mails, or the facilities of a national securities exchange, with scienter:

- 15 -

a.   employed devices, schemes, or artifices to defraud;

b.   made untrue statements of material facts or omitted to state material facts necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading; and/or

c.   engaged in acts, practices, or courses of business which operated or would operate as a fraud or deceit upon any person.

75.   By engaging in the foregoing conduct, Scammell violated, and unless enjoined will continue to violate, Section 10(b) of the Exchange Act, 15 U.S.C. § 78j(b), and Rule 10b-5 thereunder, 17 C.F.R. § 240.10b-5.

## PRAYER FOR RELIEF

WHEREFORE, the Commission respectfully requests that the Court:

### I.

Issue findings of fact and conclusions of law that Scammell committed the alleged violations.

### II.

Issue judgments, in a form consistent with Fed. R. Civ. P. 65(d), permanently enjoining Defendant Scammell and his agents, servants, employees, attorneys, and those persons in active concert or participation with him, who receive actual notice of the order by personal service or otherwise, from violating Section 10(b) of the Exchange Act, 15 U.S.C. § 78j(b), and Rule 10b-5 thereunder, 17 C.F.R. § 240.10b-5.

### III.

Order Scammell to disgorge the illegal trading profits described herein, plus prejudgment interest.

### IV.

Order Scammell to pay a civil penalty under Section 21A of the Exchange Act, 15 U.S.C. § 78u-1.

**V.**

Retain jurisdiction of this action in accordance with the principles of equity and the Federal Rules of Civil Procedure in order to implement and carry out the terms of all orders and decrees that may be entered, or to entertain any suitable application or motion for additional relief within the jurisdiction of this Court.

**VI.**

Grant such other and further relief as this Court may determine to be just and necessary.

DATED:  August  11, 2011                              _Teri M. Melson_

                                        SPENCER E. BENDELL
                                        TERI M. MELSON
                                        Attorneys for Plaintiff
                                        Securities and Exchange Commission

# UNITED STATES DISTRICT COURT
# CENTRAL DISTRICT OF CALIFORNIA

### NOTICE OF ASSIGNMENT TO UNITED STATES MAGISTRATE JUDGE FOR DISCOVERY

This case has been assigned to District Judge Dale S. Fischer and the assigned discovery Magistrate Judge is Michael Wilner.

The case number on all documents filed with the Court should read as follows:

## CV11- 6597 DSF (MRWx)

Pursuant to General Order 05-07 of the United States District Court for the Central District of California, the Magistrate Judge has been designated to hear discovery related motions.

All discovery related motions should be noticed on the calendar of the Magistrate Judge

=========================================================

**NOTICE TO COUNSEL**

*A copy of this notice must be served with the summons and complaint on all defendants (if a removal action is filed, a copy of this notice must be served on all plaintiffs).*

Subsequent documents must be filed at the following location:

| [X] **Western Division**<br>312 N. Spring St., Rm. G-8<br>Los Angeles, CA 90012 | [ ] **Southern Division**<br>411 West Fourth St., Rm. 1-053<br>Santa Ana, CA 92701-4516 | [ ] **Eastern Division**<br>3470 Twelfth St., Rm. 134<br>Riverside, CA 92501 |
|---|---|---|

Failure to file at the proper location will result in your documents being returned to you.

Spencer E. Bendell, Cal. Bar No. 181220
Teri M. Melson, Cal. Bar No. 185209
Securities and Exchange Commission
5670 Wilshire Boulevard, 11th Floor
Los Angeles, CA 90036
(323) 965-3998

## UNITED STATES DISTRICT COURT
## CENTRAL DISTRICT OF CALIFORNIA

| SECURITIES AND EXCHANGE COMMISSION | CASE NUMBER |
|---|---|
| PLAINTIFF(S)<br><br>v.<br><br>TOBY G. SCAMMELL<br><br>DEFENDANT(S). | LACV11-6597DSF(MRWx)<br><br>**SUMMONS** |

TO:   DEFENDANT(S):   Toby G. Scammell

A lawsuit has been filed against you.

Within __21__ days after service of this summons on you (not counting the day you received it), you must serve on the plaintiff an answer to the attached ☑ complaint ☐ _____ amended complaint ☐ counterclaim ☐ cross-claim or a motion under Rule 12 of the Federal Rules of Civil Procedure.   The answer or motion must be served on the plaintiff's attorney, _Spencer E. Bendell/Teri M. Melson____, whose address is _listed above_____. If you fail to do so, judgment by default will be entered against you for the relief demanded in the complaint.  You also must file your answer or motion with the court.

Clerk, U.S. District Court

Dated: __AUG 1 1 2011__

By: ___SUSANA P. BUSTAMANTE___
Deputy Clerk

*(Seal of the Court)*

*[Use 60 days if the defendant is the United States or a United States agency, or is an officer or employee of the United States.  Allowed 60 days by Rule 12(a)(3)].*

**UNITED STATES DISTRICT COURT, CENTRAL DISTRICT OF CALIFORNIA**
CIVIL COVER SHEET

**I (a) PLAINTIFFS** (Check box if you are representing yourself ☐)
SECURITIES AND EXCHANGE COMMISSION

**DEFENDANTS**
TOBY G. SCAMMELL

**(b)** Attorneys (Firm Name, Address and Telephone Number. If you are representing yourself, provide same.)

Spencer E. Bendell and/or Teri M. Melson   (323) 965-3998
Securities and Exchange Commission
5670 Wilshire Boulevard, 11th Floor, Los Angeles, CA 90036

Attorneys (If Known)

Miles Ehrlich          (510) 548-3600
Ramsey & Ehrlich, LLP
803 Hearst Avenue
Berkeley, CA 94710

**II. BASIS OF JURISDICTION** (Place an X in one box only.)

☑ 1 U.S. Government Plaintiff
☐ 2 U.S. Government Defendant
☐ 3 Federal Question (U.S. Government Not a Party)
☐ 4 Diversity (Indicate Citizenship of Parties in Item III)

**III. CITIZENSHIP OF PRINCIPAL PARTIES** - For Diversity Cases Only
(Place an X in one box for plaintiff and one for defendant.)

|  | PTF | DEF |  | PTF | DEF |
|---|---|---|---|---|---|
| Citizen of This State | ☐ 1 | ☐ 1 | Incorporated or Principal Place of Business in this State | ☐ 4 | ☐ 4 |
| Citizen of Another State | ☐ 2 | ☐ 2 | Incorporated and Principal Place of Business in Another State | ☐ 5 | ☐ 5 |
| Citizen or Subject of a Foreign Country | ☐ 3 | ☐ 3 | Foreign Nation | ☐ 6 | ☐ 6 |

**IV. ORIGIN** (Place an X in one box only.)

☑ 1 Original Proceeding
☐ 2 Removed from State Court
☐ 3 Remanded from Appellate Court
☐ 4 Reinstated or Reopened
☐ 5 Transferred from another district (specify):
☐ 6 Multi-District Litigation
☐ 7 Appeal to District Judge from Magistrate Judge

**V. REQUESTED IN COMPLAINT: JURY DEMAND:** ☐ Yes ☑ No (Check 'Yes' only if demanded in complaint.)

**CLASS ACTION under F.R.C.P. 23:** ☐ Yes ☑ No ☐ **MONEY DEMANDED IN COMPLAINT: $**_____

**VI. CAUSE OF ACTION** (Cite the U.S. Civil Statute under which you are filing and write a brief statement of cause. Do not cite jurisdictional statutes unless diversity.)
Securities Fraud; 15 U.S.C. §78j(b) &17 C.F.R. §240.10b-5 thereunder.

**VII. NATURE OF SUIT** (Place an X in one box only.)

| OTHER STATUTES | CONTRACT | TORTS PERSONAL INJURY | TORTS PERSONAL PROPERTY | PRISONER PETITIONS | LABOR |
|---|---|---|---|---|---|
| ☐ 400 State Reapportionment | ☐ 110 Insurance | ☐ 310 Airplane | ☐ 370 Other Fraud | ☐ 510 Motions to Vacate Sentence Habeas Corpus | ☐ 710 Fair Labor Standards Act |
| ☐ 410 Antitrust | ☐ 120 Marine | ☐ 315 Airplane Product Liability | ☐ 371 Truth in Lending | ☐ 530 General | ☐ 720 Labor/Mgmt. Relations |
| ☐ 430 Banks and Banking | ☐ 130 Miller Act | ☐ 320 Assault, Libel & Slander | ☐ 380 Other Personal Property Damage | ☐ 535 Death Penalty | ☐ 730 Labor/Mgmt. Reporting & Disclosure Act |
| ☐ 450 Commerce/ICC Rates/etc. | ☐ 140 Negotiable Instrument | ☐ 330 Fed. Employers' Liability | ☐ 385 Property Damage Product Liability | ☐ 540 Mandamus/ Other |  |
| ☐ 460 Deportation | ☐ 150 Recovery of Overpayment & Enforcement of Judgment | ☐ 340 Marine | **BANKRUPTCY** | ☐ 550 Civil Rights | ☐ 740 Railway Labor Act |
| ☐ 470 Racketeer Influenced and Corrupt Organizations |  | ☐ 345 Marine Product Liability | ☐ 422 Appeal 28 USC 158 | ☐ 555 Prison Condition | ☐ 790 Other Labor Litigation |
| ☐ 480 Consumer Credit | ☐ 151 Medicare Act | ☐ 350 Motor Vehicle | ☐ 423 Withdrawal 28 USC 157 | **FORFEITURE / PENALTY** | ☐ 791 Empl. Ret. Inc. Security Act |
| ☐ 490 Cable/Sat TV | ☐ 152 Recovery of Defaulted Student Loan (Excl. Veterans) | ☐ 355 Motor Vehicle Product Liability | **CIVIL RIGHTS** | ☐ 610 Agriculture | **PROPERTY RIGHTS** |
| ☐ 810 Selective Service | ☐ 153 Recovery of Overpayment of Veteran's Benefits | ☐ 360 Other Personal Injury | ☐ 441 Voting | ☐ 620 Other Food & Drug | ☐ 820 Copyrights |
| ☑ 850 Securities/Commodities/ Exchange |  | ☐ 362 Personal Injury-Med Malpractice | ☐ 442 Employment | ☐ 625 Drug Related Seizure of Property 21 USC 881 | ☐ 830 Patent |
| ☐ 875 Customer Challenge 12 USC 3410 | ☐ 160 Stockholders' Suits | ☐ 365 Personal Injury-Product Liability | ☐ 443 Housing/Acco-mmodations |  | ☐ 840 Trademark |
| ☐ 890 Other Statutory Actions | ☐ 190 Other Contract | ☐ 368 Asbestos Personal Injury Product Liability | ☐ 444 Welfare | ☐ 630 Liquor Laws | **SOCIAL SECURITY** |
| ☐ 891 Agricultural Act | ☐ 195 Contract Product Liability | **IMMIGRATION** | ☐ 445 American with Disabilities - Employment | ☐ 640 R.R. & Truck | ☐ 861 HIA (1395ff) |
| ☐ 892 Economic Stabilization Act | ☐ 196 Franchise | ☐ 462 Naturalization Application | ☐ 446 American with Disabilities - Other | ☐ 650 Airline Regs | ☐ 862 Black Lung (923) |
| ☐ 893 Environmental Matters | **REAL PROPERTY** | ☐ 463 Habeas Corpus-Alien Detainee | ☐ 440 Other Civil Rights | ☐ 660 Occupational Safety /Health | ☐ 863 DIWC/DIWW (405(g)) |
| ☐ 894 Energy Allocation Act | ☐ 210 Land Condemnation | ☐ 465 Other Immigration Actions |  | ☐ 690 Other | ☐ 864 SSID Title XVI |
| ☐ 895 Freedom of Info. Act | ☐ 220 Foreclosure |  |  |  | ☐ 865 RSI (405(g)) |
| ☐ 900 Appeal of Fee Determi-nation Under Equal Access to Justice | ☐ 230 Rent Lease & Ejectment |  |  |  | **FEDERAL TAX SUITS** |
| ☐ 950 Constitutionality of State Statutes | ☐ 240 Torts to Land |  |  |  | ☐ 870 Taxes (U.S. Plaintiff or Defendant) |
|  | ☐ 245 Tort Product Liability |  |  |  | ☐ 871 IRS-Third Party 26 USC 7609 |
|  | ☐ 290 All Other Real Property |  |  |  |  |

LACV11-6597

FOR OFFICE USE ONLY:   Case Number: _____

**AFTER COMPLETING THE FRONT SIDE OF FORM CV-71, COMPLETE THE INFORMATION REQUESTED BELOW.**

CV-71 (05/08)          CIVIL COVER SHEET          Page 1 of 2

## UNITED STATES DISTRICT COURT, CENTRAL DISTRICT OF CALIFORNIA
### CIVIL COVER SHEET

**VIII(a). IDENTICAL CASES:** Has this action been previously filed in this court and dismissed, remanded or closed? ☑ No   ☐ Yes
If yes, list case number(s): _____

**VIII(b). RELATED CASES:** Have any cases been previously filed in this court that are related to the present case? ☑ No   ☐ Yes
If yes, list case number(s): _____

**Civil cases are deemed related if a previously filed case and the present case:**
(Check all boxes that apply)   ☐ A.  Arise from the same or closely related transactions, happenings, or events; or
                               ☐ B.  Call for determination of the same or substantially related or similar questions of law and fact; or
                               ☐ C.  For other reasons would entail substantial duplication of labor if heard by different judges; or
                               ☐ D.  Involve the same patent, trademark or copyright, _and_ one of the factors identified above in a, b or c also is present.

**IX. VENUE:** (When completing the following information, use an additional sheet if necessary.)

(a)   List the County in this District; California County outside of this District; State if other than California; or Foreign Country, in which **EACH** named plaintiff resides.
☑   Check here if the government, its agencies or employees is a named plaintiff.  If this box is checked, go to item (b).

| County in this District:* | California County outside of this District; State, if other than California; or Foreign Country |
|---|---|
|  |  |

(b)   List the County in this District; California County outside of this District; State if other than California; or Foreign Country, in which **EACH** named defendant resides.
☐   Check here if the government, its agencies or employees is a named defendant.  If this box is checked, go to item (c).

| County in this District:* | California County outside of this District; State, if other than California; or Foreign Country |
|---|---|
|  | Toby G. Scammell - Marin County |

(c)   List the County in this District; California County outside of this District; State if other than California; or Foreign Country, in which **EACH** claim arose.
      **Note: In land condemnation cases, use the location of the tract of land involved.**

| County in this District:* | California County outside of this District; State, if other than California; or Foreign Country |
|---|---|
| Los Angeles County |  |

**\* Los Angeles, Orange, San Bernardino, Riverside, Ventura, Santa Barbara, or San Luis Obispo Counties**
**Note:** In land condemnation cases, use the location of the tract of land involved.

X.  SIGNATURE OF ATTORNEY (OR PRO PER):  _Teri M. Nelson_   Date  _August 11, 2011_

Notice to Counsel/Parties:   The CV-71 (JS-44) Civil Cover Sheet and the information contained herein neither replace nor supplement the filing and service of pleadings or other papers as required by law. This form, approved by the Judicial Conference of the United States in September 1974, is required pursuant to Local Rule 3-1 is not filed but is used by the Clerk of the Court for the purpose of statistics, venue and initiating the civil docket sheet. (For more detailed instructions, see separate instructions sheet.)

Key to Statistical codes relating to Social Security Cases:

| Nature of Suit Code | Abbreviation | Substantive Statement of Cause of Action |
|---|---|---|
| 861 | HIA | All claims for health insurance benefits (Medicare) under Title 18, Part A, of the Social Security Act, as amended. Also, include claims by hospitals, skilled nursing facilities, etc., for certification as providers of services under the program. (42 U.S.C. 1935FF(b)) |
| 862 | BL | All claims for "Black Lung" benefits under Title 4, Part B, of the Federal Coal Mine Health and Safety Act of 1969. (30 U.S.C. 923) |
| 863 | DIWC | All claims filed by insured workers for disability insurance benefits under Title 2 of the Social Security Act, as amended; plus all claims filed for child's insurance benefits based on disability. (42 U.S.C. 405(g)) |
| 863 | DIWW | All claims filed for widows or widowers insurance benefits based on disability under Title 2 of the Social Security Act, as amended. (42 U.S.C. 405(g)) |
| 864 | SSID | All claims for supplemental security income payments based upon disability filed under Title 16 of the Social Security Act, as amended. |
| 865 | RSI | All claims for retirement (old age) and survivors benefits under Title 2 of the Social Security Act, as amended. (42 U.S.C. (g)) |